IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

          Plaintiff,                    CR. NO. S-08-0427 MCE (GGH)

     vs.                            ORDER

VARDGES EGIAZARIAN, et al.,

          Defendants.

_____/

*Introduction and Summary*

        The United States vigorously disputes the Central District of California  release order of the above referenced defendant Egiazarian issued on August 14, 2008, who made his appearance in that District on a complaint issued out of the Eastern District of California.  On August 27, 2008, prior to the September 17, 2008 indictment in the Eastern District on Health Care (Medicare) fraud (assigned to the Honorable Morrison England), the Honorable Frank Damrell had stayed the Central District release order pending final ruling on the government's motion to revoke the release order filed in the Central District.  Pursuant to the local rules of this District, the motion to revoke was heard by the undersigned on September 26, 2008.

        For the reasons set forth herein, the motion to revoke is granted on the basis of flight risk only.

*Discussion*

A. <u>The Government Has Properly Made a Motion to Revoke the Central District Order in This District</u>

Egiazarian first disputes the propriety of challenge to the release order issued in the Central District by claiming that the procedures for "reopening" the release order as set forth in 18 U.S.C. § 3142(f), i.e., "new and material" information, have not been met.  However, Egiazarian is mistaken that the government's motion to revoke is a § 3142(f) proceeding.  Rather, the motion is made pursuant to 18 U.S.C. § 3145(a)(1), which expressly authorizes the district of indictment to review an out-of-district release order on motion by the government.

Section 3145 does not set forth a standard of review for the out-of-district determination; however, because reviews of in-district release orders are also part of the same section, it stands to reason that the matter is one of *de novo* review.  <u>See</u> <u>United States v. Freitas</u>, 602 F. Supp. 1283, 1293 (N.D. Cal. 1985).

B. <u>"Danger to the Community" Is Not a Permitted Bsis for Detention</u>

The government has moved to revoke Egiazarian's release order, in part, because it senses that Egiazarian's release would pose a danger to the community.  The government's motion on this ground is not legally tenable.

The *sine qua non* for a finding of danger to the community in the detention context, under the criminal justice system in which defendants find themselves, is that defendants have been charged with an offense which authorizes the court to make the finding.  The court is not authorized to detain a person based on his dangerousness per se regardless of the charge, but only if the crime charged permits the finding in the first instance.  <u>United States v. Twine</u>, 344 F. 3d 987 (9th Cir. 2003).  Despite some ambiguity in the controlling statute, 18 U.S.C. § 3142(f), nearly every court to squarely rule on the subject has determined that a defendant may not be detained as a danger to the community unless one of the "triggers" in subsection (f)(1) is present.  <u>See</u> <u>United States v. Giordano</u>, 370 F. Supp. 2d 1256 (S.D. Fla. 2005) citing <u>United States v.</u>

2

1   <u>Byrd</u>, 969 F.2d 106, 109-10 (5th Cir. 1992); <u>United States v. Ploof</u>, 851 F. 2d 7, 11 (1st Cir.

2   1988); <u>United States v. Himler</u>, 797 F.2d 156, 160 (3rd Cir. 1986).  All of the cited cases stand

3   for the proposition that an (f)(1) circumstance is necessary in order to make a danger finding.

4   <u>See</u> <u>also</u> <u>United States v. DeBeir</u>, 16 F. Supp. 2d 592 (D. Md. 1998); <u>United States v. Jamal</u>, 285

5   F. Supp. 2d 1221, 1222 (D. Ariz. 2003), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds,</u> 326 F. Supp. 2nd 1006 (D.

6   Ariz. 2003).  Although not directly on point, <u>United States v. Salerno</u>, 481 U.S. 739, 747, 107 S.

7   Ct. 2095, 2101 (1987) (upholding the danger-to-the-community detention basis) is instructive:

8   "The Bail Reform Act carefully limits the circumstances under which detention may be sought to

9   the most serious crimes.  See 18 U.S.C. § 3142(f) (detention hearings available if case involves

10  crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug

11  offenses, or certain repeat offenders)."

12          In past cases, the government plausibly, but ultimately non-persuasively, has read

13  the statute otherwise.  It contends that the introductory "heading" in subsection (f), which permits

14  a finding of flight risk *and* danger controls both sub-sub sections (1) and (2) because of the

15  disjunctive "or" at the close of (1).  Of course, (2) refers to flight risk only (and one category of

16  violence – obstruction of justice). The government argues that once a hearing is ordered under

17  flight risk, the court may then detain on a danger basis.  However, the above-referenced cases

18  which have researched the legislative history do not agree.  These cases hold that Congress

19  intended to limit the number of crimes for which persons could be held as a danger to the

20  community, especially in light of the presumption that pre-trial release is the norm and not the

21  exception.  <u>See</u> <u>United States v. Gebro</u>, 948 F.2d 1118, 1121 (9th Cir. 1991) ("[o]nly in rare

22  circumstances should release be denied, and doubts regarding the propriety of release should be

23  resolved in the defendant's favor.").

24          Nor do the cases of <u>United States v. Byrd</u>, <u>supra</u>,or <u>United States v. Singleton</u>, 182

25  F.3d 7 (D.C. Cir. 1999) assist the government's position (as the government has argued in other

26  cases).  <u>Byrd</u> clearly held that an (f)(1) trigger was necessary.  ("Dr. Byrd could have been

1   detained only if the government had *also* established that the case against him involves a crime

2   of violence."). <u>Byrd, supra</u>, at 110 (emphasis in original).  The only possible assistance <u>Byrd</u>

3   renders to the government is that this court found that the charged offense did not have to be a

4   crime of violence as long as the "case" involves a crime of violence.  It is difficult for the

5   undersigned to understand how under the statute as a whole the case against the defendant

6   involves violence if the charged offense does not.  Although § 3142(f)(1) does indeed use the

7   terminology:  "[U]pon motion of the attorney for the government, in a case that involves – (A) a

8   crime of violence....", the "involves" is simply a plural reference for the conditions set forth in

9   (f)(1).  The statute does not mean to convey an impression that the charged offense does not have

10  to be a crime of violence.  The need for the charged offense to be the crime of violence is

11  precisely the holding of <u>United States v. Singleton</u>, 182 F.3d at 12, 14.

12          Egiazarian cannot be detained on a danger to the community basis – economic or

13  otherwise.[1]

14      C.   <u>The Government Has Shown By a Preponderance of the Evidence That Egiazarian is a</u>

15          <u>Flight Risk</u>

16          Obviously, there is risk in every decision to order release pretrial.  No

17  adjudicating official can probe the present and future mind set of a defendant in such verifiable

18  detail to guarantee that no flight will occur.  Nevertheless, the law does not require such absolute

19  assurance, <u>United States v. Orta</u>, 760 F.2d 887 (8th Cir. 1985); rather, it is the government's

20  burden pretrial by a preponderance of the evidence to demonstrate that no conditions or

21  combinations of conditions can be set which *reasonably* will assure the defendant's appearance.

22  Congress has indicated that, overall, pretrial release is the rule, and detention is the exception.

23

24          [1] The rule is different after the initial detention hearing, e.g., <u>see</u> 18 U.S.C. 3143;
    however, it is clear that *initially*, economic danger may not be taken into account, and actual,

25  physical harm danger cannot be considered unless there is a triggering offense.  <u>See United States</u>
    <u>v. Reynolds</u>, 956 F.2d 192 (9th Cir. 1992) (assessing economic danger to the community on a

26  request to be released pending appeal; <u>United States v. Gill</u>, 2008 WL 2120069 (E.D. Cal. 2008).

1   As observed above, "[o]nly in rare circumstances should release be denied, and doubts regarding

2   the propriety of release should be resolved in the defendant's favor."  United States v. Gebro,

3   supra at 1121 (citing United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985)).

4      The statute, § 3142(g), lists three categories of information relevant to the flight

5   risk analysis: (1) The nature and circumstances of the offense charged; (2) the weight of the

6   evidence against the person; and (3) the history and characteristics of the person.  With respect to

7   category (1), the nature of the charged offense, analysis is intuitive.  That is, there are some

8   crimes by their nature which suggest flight, e.g., prison escape, and some crimes which do not

9   suggest flight at all, e.g., non-aggravated battery.  Also very pertinent to this category is the

10  potential, realistic sentence to be imposed if the defendant is found guilty.  It takes no extensive

11  exercise in logic to realize that the more potential time one can be locked away in prison, the

12  more tendency there may be to flee.

13     In this case, the charged offense of healthcare fraud is not one which suggests

14  flight just from a common sense standpoint.  And the penalties, although not light, have a

15  maximum of 10 years in prison – a maximum which is rarely obtained especially where the

16  presently stated loss is "only" in the low six figures ("more than $350,000" as set forth in the

17  indictment).  While the prosecutor suggested that there may be other fraud cases involving

18  Egiazarian, this unproven suggestion is not a basis in the record for detaining the defendant.  The

19  nature of the offense does not favor the government's position and points to release on bond.

20     The undersigned is not in a position to assess the weight of the evidence in this

21  document intensive fraud case; therefore this factor is neutral.

22     The third category consists of a myriad of sub-factors, includes financial resources

23  to deter flight, and is the category which weighs in the government's favor when considered in its

24  totality.  At first, the ability of the defendant to secure a substantial bond, in the neighborhood of

25  $450,000, weighs in favor of release.  And in one sense, the very strong ties that Egiazarian

26  clearly maintains in his ethnic community also favors release.  However, on consideration of

1   other factors, release becomes much more problematic.

2           The search of Egiazarian's offices revealed many indications for potential flight.

3   Egiazarian maintained identification (drivers licenses, Social Security card) and credit cards in

4   false names (David Ackerman and Ron Reubens).  He also had other apparently fraudulent

5   drivers licenses.   Egiazarian had substantial sums of cash in his office.  He also had materials

6   which would help disguise his true appearance – a dark colored wig and a dark colored mustache.

7   These are true indicia of flight risk.  Egiazarian was born in Armenia, and came to this country as

8   an adult.  It stands to reason, although it is not known for sure, that he maintains ties in his native

9   land.  One of Egiazarian's sons is presently visiting Armenia, or was at the time of Egiazarian's

10  arrest.

11          Also problematic for Egiazarian is the fact that a loaded zip gun and silencer were

12  found during the search of Egiazarian's office.  Zip guns with silencers, possession of which is

13  certainly a crime in and of itself, 28 U.S.C. §§ 5845 (a)(7), 5861(d); 18 U.S.C. § 921 (a)(24),

14  have no legitimate use except to harm persons in a surreptitious manner.  Perhaps realizing this,

15  Egiazarian filed a notarized declaration from a soon-to-be-deported Armenian friend that the zip

16  gun and silencer were owned by the friend and given to Egiazarian only for safekeeping.

17  However, as observed by the undersigned at hearing, the ability of Egiazarian to have a friend

18  sign a declaration that he is in violation of United States firearms laws bespeaks such a control

19  and authority in the ethnic community that Egiazarian has persons who would help him flee if

20  asked.  Either Egiazarian had the declarant lie about the weapon, thinking that the declarant

21  would suffer no harm because he was soon to be deported anyway, or defendant prevailed upon

22  him to admit to a crime (which could be punishable prior to deportation) in order to help

23  Egiazarian be released.  Both scenarios connote an ability to flee.  They are both unsettling in

24  indicating a desire to be released so badly that a specter of flight is raised.  It raises the specter

25  also that someone might well be ready to lose property if only to help this defendant – so what is

26  the true worth of the bond for deterrent purposes.

_Conclusion_

        For the foregoing reasons, the government's motion to revoke release (Docket # 6)[2] is granted, and defendant Egiazarian is ordered detained as a flight risk.

        IT IS SO ORDERED.

DATED: September 30, 2008

                        /s/ Gregory G. Hollows
_____

                    UNITED STATES MAGISTRATE JUDGE

egiazarian.ord

---

[2]Presently two docket # 6s appear on the docket.